UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


| | |
|---|---|
| INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 98 HEALTH AND WELFARE FUND, ET AL.,<br>　　　Plaintiffs,<br><br>　　　　　　　v.<br><br>BRADWAY CONSTRUCTION, INC., and SCOTT C. BRADWAY,<br>　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)  C.A. No. 14-cv-10052-MAP<br>)<br>)<br>)<br>)<br>) |


MEMORANDUM AND ORDER REGARDING
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
AND ATTORNEY FEES AND COSTS AND
DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT
(Dkt. Nos. 31 & 35)

September 30, 2015

PONSOR, U.S.D.J.

## I.   INTRODUCTION

Plaintiffs[1] bring this four-count complaint against

Defendants Bradway Construction, Inc., and Scott C. Bradway

---

[1] Plaintiffs are the International Union of Operating Engineers Local 98 Health and Welfare Fund, International Union of Operating Engineers Local 98 Pension Fund, International Union of Operating Engineers Local 98 Annuity Fund, Local 98 Engineers Joint Training, Retraining, Skill Improvement, Safety Education, Apprenticeship and Training Fund, International Union of Operating Engineers Local 98 and Employers Cooperative Trust, Central Pension Fund of the International Union of Operating Engineers and Participating Employers, and International Union of Operating Engineers Local 98, AFL-CIO (collectively, "Plaintiffs").

(individually and as an officer of Bradway Construction),
pursuant to the Employee Retirement Income Security Act of
1974 ("ERISA"), as amended, 29 U.S.C. §§ 1145 & 1132(g)(2),
and the Labor-Management Relations Act of 1947("LMRA"), 29
U.S.C. § 185.  Plaintiffs allege Defendants failed to make
timely contributions and remit employee payroll
withholdings, as well as to submit monthly reports of the
number of hours worked by each employee, as required under
the owner-operator and collective bargaining agreements.
Defendants filed cross-claims against Plaintiffs for
supplying false information to Defendants' customers, who
justifiably relied on that false information, causing
pecuniary loss to Defendants, as well as for violation of
the Massachusetts Consumer Protection Act, Mass. Gen. Laws
ch. 93A, §§ 2 & 9, and for intentional interference with
advantageous business relationships.

Plaintiffs filed a motion for summary judgment, seeking
judgment in the amount of $459,534.08 for the period January
1, 2010, through May 31, 2013, and for fees and costs.
(Dkt. No. 31.)  Defendants filed a cross-motion for summary
judgment.  (Dkt. No. 35.)  For the reasons that follow, the

2

court will allow in part Plaintiffs' motion and deny
Defendants' motion.

## II.   BACKGROUND

The facts are recited in the light most favorable to
the non-moving party, as required by Federal Rules of Civil
Procedure 56.  See Mass. Carpenters Cent. Collection Agency
v. Belmont Concrete Corp., 139 F.3d 304, 306 (1st Cir.
1998).

The primary issues in dispute are whether the Owner-
Operator Agreement can expire and whether Defendants
adequately provided timely notice of their intent to
withdraw from the Collective Bargaining Agreement (CBA).
Accordingly, the court will review only the relevant
portions of the various contracts, particularly, those
provisions addressing the duration and termination of the
agreements.  Likewise, the court will limit its recitation
of the facts to those pertaining to the parties' actions
surrounding the agreements.

The parties sharply dispute the time frame in which

certain employees performed covered work.[2]  These facts go
to the amount in damages claimed by Plaintiffs.  Because
Defendants have requested an opportunity to challenge
Plaintiffs' calculation of damages, the court will deny
Plaintiffs' motion for summary judgment on damages and allow
for further briefing.  It is not necessary to summarize
damage-related facts at this time.

A.   <u>Terms of the Agreements</u>

On July 30, 2005, Defendants signed an Owner-Operator
Agreement with Plaintiff Local 98, binding them to the terms
of the Massachusetts Heavy & Highway CBA.  (Agreement, Ex.
K, Dkt. No. 31, Attach. 8.)  The terms of the CBA covered
all work within the jurisdiction of the union, regardless of
whether that work was undertaken by a union member.  This
agreement provided that Defendants agreed to "adopt, abide
by and be bound by all the terms, conditions and provisions"
of agreements between the Union and the employers'
associations.  (<u>Id.</u> ¶ 3 at 2.)

---

[2]  Defendants dispute the hours considered as covered
work completed by Mark Bradway, Keith Bradway, and William
Fern for the period of January 1, 2010, to May 31, 2010, as
well as those hours worked by Scott Bradway in the same time
frame.  (Defs.' Resp. ¶¶ 17 & 18, Dkt. No. 37.)

Moreover, Defendants "agree[d] to be bound by any current or subsequent amendments, modifications or interpretations of the Agreements." (Id.)  Defendants also assented to remitting contributions to Plaintiff Funds, as well as to being bound to the declarations of trust for those funds and their collections policies.  (Id. ¶¶ 4 & 9 at 2 & 4.)

With regard to termination, the Owner-Operator Agreement provided: "This Owner-Operator Agreement will remain in full force and effect unless terminated by either party upon written notice at least thirty (30) days before the expiration date of the Agreements in effect within the jurisdiction of the Union and governing the Employer's work."  (Id. ¶ 12 at 4.)

The year after the parties executed the Owner-Operator Agreement, the Labor Relations Division of the Construction Industry of Massachusetts and the union Plaintiff entered into a new collective bargaining agreement (2006 CBA).  It is undisputed that Defendants were bound to the 2006 CBA. The terms of the 2006 CBA became effective as of June 1, 2006, and continued in effect until May 31, 2010, "subject

5

to the following conditions": the agreement would continue in force from year to year "unless either party on or before March 1, 2010 or prior to March 1st in any year thereafter gives notice in writing to the other party of its intention to terminate." (2006 CBA 17, Ex. M, Dkt. No. 31, Attach. 8 at 45; Defs.' Resp. ¶ 10 ("The Defendants agree that the Owner-Operator Agreement and 2006 CBA binds Defendants to the Agreement and Declarations of Trust...."), Dkt. No. 37.)

The 2006 CBA ran from June 1, 2006, until May 31, 2010, when the 2010 CBA came into force.  The termination procedures were the same under both CBAs: a party had to give notice in writing of its intention to terminate to the other party on or before March 1st of the year the CBA would expire.  (2010 CBA 19, Ex. L, Dkt. No. 31, Attach. 8 at 25.)

B.    Facts

Defendant Bradway Construction, Inc., is a Massachusetts corporation; Defendant Scott C. Bradway is the president and officer of Bradway Construction.  On June 30, 2005, Defendants signed the Owner-Operator Agreement with Local 98, binding them to the then-in-effect CBA, which ran from 2002 until mid-2006.  (Pls.' Resp. ¶ 6 ("When

6

Defendants executed the Owner-Operator Agreement in June 2005, Defendants were bound to the [2002 CBA].”), Dkt. No. 40.)  On June 1, 2006, a new CBA came into force.  The parties do not dispute that from June 1, 2006, through December 31, 2009, Defendants complied with the terms of the 2006 CBA.

In December 2009, Defendant Bradway, in some fashion, contacted Plaintiffs and advised that he and his company “were no longer performing work covered by the [CBA] and that Defendant Corporation would be ceasing operations.” (Melville, Jr. Aff. ¶ 15, Dkt. No. 31, Attach. 3 at 5.)  The record is not clear how this contact occurred, whether by telephone, in person, or through a third party.  Defendants assert that this “contact” with the Union also informed it that Defendants “wanted to terminate all agreements.”  (S. Bradway Aff. ¶ 2, Dkt. No. 46, Attach. 1 at 3.)  In response to this contact, on December 17, 2009, Plaintiff Union issued to Defendant Bradway, individually, a Certificate of Honorable Withdrawal, effective December 31, 2009.  The certificate states, “This is to certify, That Scott Bradway having signed that he/she has ceased or intends to cease

7

performing the work of an Operating Engineer ..., and having
requested a withdrawal card, we hereby grant him/her this
Certificate of Honorable Withdrawal."   (Dkt. No. 46, Attach.
3.)

In September 2010, Defendants received a copy of the
new 2010 CBA along with a letter requesting a signature.
The letter included a "Short Form" which, if signed by
Defendants, would have converted the parties' Section 8(f)
relationship into a Section 9(a) relationship under the
National Labor Relations Act ("NLRA").   (Melville Reply Aff.
¶ 13, Dkt. No. 39, Attach. 1.)   By letter dated September
30, 2010, Defendants acknowledged receipt of the 2010 CBA.
(Bradway Aff. ¶ 4 ("I received a letter dated September 15,
2010, from the Plaintiff Union requesting acceptance of the
2010 Massachusetts Heavy and Highway Agreement...."), Dkt.
No. 35, Attach. 1.)   Defendants replied by mail that they
would not renew the CBA.   (Dkt. No. 31, Attach. 7 at 80.)
Furthermore, Defendants stated, "Any and all agreements
between Bradway Construction, Inc. and I.U.O.E. Local 987
are now terminated.   Thank you for many years of service but

Bradway Construction will remain a non-union business."[3]
Id.  Plaintiffs did not respond to that letter.  Thereafter, there was no contact between the parties for almost two years.

In 2012, Defendants were working on a project for Balise Ford.  On November 29, 2012, after learning of this job, Plaintiffs requested an audit of Defendants for the period of January 2010 to November 2012.  On December 10, 2013, and again on January 2, 2013, Defendants sent letters to Plaintiffs explaining that they had terminated the 2006 CBA and had not signed the 2010 CBA.  Plaintiffs responded that they had not received a termination letter in September of 2010, which Defendants then forwarded to them.

Also in December 2012, Plaintiffs sent a letter to the Associated Builders & Contractors, as well as Balise Ford, stating that Defendants failed to remit required reports and

---

[3]  It is undisputed that this letter effectively terminated the Owner-Operator Agreement, effective May 31, 2013, the expiration date of the 2010 CBA.  However, because this September 30, 2010, letter was not received "at least thirty (30) days before the expiration date of the Agreements in effect" -- in other words, within thirty days of May 31, 2010, when the 2006 CBA expired -- Defendants were bound to the 2010 CBA.  (Agreement ¶ 12, Ex. K, Dkt. No. 31, Attach. 8.)

contributions.  As a result of this letter, Defendants claim, the Associated Builders & Contractors did not retain the services of Defendants for over a year.  (Defs.' Resp. ¶ 33, Dkt. No. 37.)

On January 8, 2014, Plaintiffs filed this four-count, ERISA action against Defendants, seeking judgment in their favor in the amount of $459,534.08 for the period January 1, 2010, through May 31, 2013, for unpaid monies due under the terms of the 2010 CBA.  (Compl., Dkt. No. 1.)  Defendants filed a counterclaim with three counts, for supplying false information to Defendants' customers, who justifiably relied on that false information, causing pecuniary loss to Defendants; for violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A, §§ 2 & 9, in misrepresenting facts to Defendants' customers; and for intentional interference with advantageous business relationships.  (Dkt. Nos. 9 & 10.)  After Plaintiffs filed this lawsuit, Defendants agreed to submit to an audit, which resulted in a finding of $199,613.54 in contributions and deductions owed by Defendants.  (Schweitzer Aff. ¶ 31, Dkt. No. 31, Attach. 1 at 9.)

In February and March of 2015, the parties filed cross-motions for summary judgment.  (Dkt. Nos. 31 & 35.)  The court heard argument on May 13, 2015, and took the motions under advisement.  On August 27, 2015, Plaintiffs sought leave to submit further filings, which the court permitted. In early September, the parties submitted supplemental memoranda[4] addressing the impact on this case of the recent First Circuit Court of Appeals decision in <u>New England Carpenters Central Collection Agency v. Labonte Drywall Company</u>, -- F.3d -- (1st Cir. 2015) (hereinafter <u>Labonte Drywall</u>).  2015 WL 4597552 at *1 (1st Cir. July 31, 2015).

### III.  <u>DISCUSSION</u>

The court will grant summary judgment where there is no genuine disagreement over the material facts and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P.

---

[4]  Plaintiffs have moved to strike certain statements contained in Defendants' Supplemental Memorandum (Dkt. No. 46), on the ground that those statements constitute unsupported factual assertions.  (Pls.' Mot. to Strike, Dkt. No. 47.)  Specifically, Plaintiffs assert that Defendants made allegations pertaining to the 2004-2009 audit referenced in the pleadings, but not set forth in any sworn affidavit.  The court will deny this motion as moot, since the facts surrounding the audit have no bearing on the court's decision, as discussed <u>infra</u>.

56(a);   Bonneau v. Plumbers & Pipefitters Local Union 51
Pension Trust Fund, 736 F.3d 33, 36 (1st Cir. 2013); Fed. R.
Civ. P. 56(a).  Where, as here, both parties have moved for
summary judgment, "the court must consider each motion
separately, drawing inferences against each movant in turn."
Reich v. John Alden Life Ins. Co., 126 F.3d 1, 6 (1st Cir.
1997).

A.   Summary of the Law

      The law is clear that courts will enforce the terms of
the CBA and Trust agreements and their concomitant
contractual obligations on employers.  See Cent. States, Se.
& Sw. Areas Pension Fund v. Cent. Transport, Inc., 472 U.S.
559, 581 (1985); Gastronomical Workers Union Local 610 &
Metro. Hotel Ass'n Pension Fund v. Dorado Beach Hotel Corp.,
617 F.3d 54, 62 (1st Cir. 2010).  Here, the primary dispute
between the parties is whether Defendants are bound to the
2010 CBA.  The parties do not dispute the terms of either
the 2006 CBA or the 2010 CBA, though they contest vigorously
how those terms ought to be interpreted.

      The determination of whether Defendants' terminated
their agreements with Plaintiffs is a question of law.  For

Defendants to have effectively terminated their agreements, their notice had to be legally adequate, which is to say adequate under the terms of the Agreements.  For a party's notice to withdraw from a CBA to be effective, it must be "both timely and unequivocal."  Haas Elec., Inc. v. N.L.R.B., 299 F.3d 23, 27 (1st Cir. 2002), quoted by Labonte Drywall, 2015 WL 4597552 at *4.  Timeliness means that the notice came "prior to the date on which negotiations are set to commence or actually commence"; unequivocal means that the notice is "unambiguous."  Hass Elec., Inc., 299 F.3d at 27-28.  The court must look to the provisions of the agreements themselves for the requirements of a notice of termination.  Labonte Drywall, 2015 WL 4597552 at *4 (noting that, in that case, "[n]othing in the four corners of the statewide agreement requires a party's notice of termination to explicitly include the words "termination," "statewide agreement," or "collective bargaining agreement").

The recent First Circuit decision in Labonte Drywall underscores the court's obligation to begin and end with the language in the agreements.  There, the defendant employer signed a statewide agreement with local unions and agreed

"to abide by the collective bargaining agreements" in place
between the union and various employer associations.  Id. at
*1.  The termination provisions of the statewide agreement
stated that it would be "co-extensive" with the terms of the
CBAs "unless either party to this statewide agreement gives
notice of termination ... in accordance with the applicable
notice provisions" of the CBAs.  Id.  The defendant sent the
union a letter stating that it was "no longer bidding or
doing union work."  Id. at *2.  Thereafter, the defendant
consistently claimed it was no longer a part of the union.
The union understood this position, as it sent
representatives to the defendant to request that it rejoin
the union.  Id. at *2 & *5.

The First Circuit concluded that the defendant had
effectively withdrawn from the CBA under the termination
provisions of the statewide agreement.  While the statewide
agreement obligated the defendant to abide by the terms of
the CBA, it did not make the defendant a signatory it.  Id.
at *8.  Despite the plaintiff's assertion that the
termination provisions of the CBAs controlled and that the
statewide agreement could not be terminated before the

expiration dates of the CBAs, the court determined that the
defendant's "agreement to abide by the terms and obligations
of the collective bargaining agreement was only incorporated
by reference in the statewide agreement." Id. at *9.
Accordingly, the defendant needed only to abide by the
termination provisions of the statewide agreement -- and not
to those outlined in the CBAs -- which permitted a party to
end the agreement with a notice of termination.

In interpreting the language of the contracts, the
First Circuit reiterated the long-standing tenet of contract
interpretation that "the agreement must be read 'in a
reasonable and practical way, consistent with its language,
background, and purpose.'" Id. at *6. Labonte Drywall also
stands for the proposition that courts can look to the
parties' conduct for confirmation that they understood a
particular interpretation of the contract. Id. at *5
(concluding that "the parties' actions demonstrate that both
understood" the letter at issue had terminated the CBA). In
sum, the First Circuit upheld the district court's finding
that the defendant's letter "expressed an unequivocal intent
to terminate" the bargaining relationship and was a "legally

15

effective termination."  Id. at *4 & *5.

Finally, CBAs are governed by principles under ERISA, the LMRA, the NLRA, and the case law interpreting those statutes.  Section 515 contribution actions under ERISA are a special class of action for which "Congress intended to protect the Funds' financial stability by limiting the scope of issues litigable when they seek to recover employers' contributions."  La. Bricklayers & Trowel Trades Pension Fund & Welfare Fund v. Alfred Miller Gen. Masonry Contracting Co., 157 F.3d 404, 408 (5th Cir. 1998). Accordingly, "only three defenses to a delinquency action have been recognized by all of the circuit courts that have considered the issues: (1) the pension contributions are illegal, (2) the CBA is void ab initio, e.g. for fraud in the execution, and (3) the employees have voted to decertify the union as their bargaining representative."  Id.  All other claims are preempted.

With this legal framework in mind, the court will now turn to the parties' arguments for summary judgment.

B.    Analysis

In support of their motion for summary judgment,

16

Plaintiffs argue that Defendants are bound to the provisions
of the 2010 CBA and are, thus, liable for all delinquencies
and costs uncovered by the audit.  Defendants put forth two
arguments supporting their position that they are not
subject to the 2010 CBA.  First, Defendants maintain that
the Owner-Operator Agreement and 2006 CBA both expired in
May 2010 and they declined to sign on to the 2010 CBA.
Second, Defendants assert that they effectively terminated
their relationship with the Union in 2009, when Defendant
Bradway received from Plaintiffs a certificate of withdrawal
confirming Defendants' intent to withdraw from the
agreements.

     Turning to the first issue, whether Defendants were
bound to the 2010 CBA, Defendants argue that because they
never signed the 2010 CBA, they are not subject to its
terms.  Specifically, Defendants claim that -- pursuant to
basic contract law -- Plaintiffs presented the 2010 CBA to
Defendants as an offer, and by not signing the new CBA,
Defendants rejected the offer.  Defendants' arguments are at
variance with the plain language of the agreements.

     An agreement "must be read 'in a reasonable and

17

practical way, consistent with its language, background, and purpose.'"  Labonte Drywall, 2015 WL 4597552 at *6.  Here, it is clear from the language, that the Owner-Operator Agreement was of indefinite duration.  The agreement specified that it would "remain in full force and effect unless terminated by either party upon written notice at least thirty (30) days before the expiration date of the Agreements in effect within the jurisdiction of the Union and governing the Employer's work."  (Agreement ¶ 3 (emphasis added), Ex. K, Dkt. No. 31, Attach. 8.)  So long as a party did not terminate it within the period specified in "the Agreements in effect," with every new CBA, the Owner-Operator Agreement continued in effect.

Further cutting against Defendants' argument that the agreement expired in 2006 is the fact that, when they first signed the Owner-Operator Agreement, the applicable CBA in force had been signed in 2002 and was set to expire the following year.  By the Defendants' logic, not only would they not be bound to the 2010 CBA, they would not have been bound to the 2006 CBA either -- a position they did not take in 2006 and do not take now.  Cf. Labonte Drywall, 2015 WL

4597552 at *5 (considering the parties' conduct in
determining their understanding of a termination notice).
Thus, because Defendants did not terminate the Owner-
Operator Agreement before the expiration of the 2002 CBA, it
rolled over to the next agreement in effect, the 2006 CBA.
The same process bound them to the 2010 CBA.

Accordingly, the only route out from under the
obligations of the 2010 CBA for the Defendants would be an
effective termination of their relationship with Plaintiff
Union.  Defendants assert that they provided timely and
adequate notice to Plaintiffs of their intent to terminate
their relationship in December 2009.  The terms of the 2006
CBA state that it "will remain in full force and effect
unless terminated by either party upon written notice at
least thirty (30) days before the [CBA's] expiration date."
(2006 CBA 17, Ex. M, Dkt. No. 31, Attach. 8 at 45.)
Defendants point to the Certificate of Honorable Withdrawal
as satisfying the requirement both for written notice of
termination and for Plaintiffs' understanding of Defendants'
intent.

In a somewhat novel twist, Defendants argue that

Plaintiffs themselves provided the written notice of
termination necessary to effectively terminate the
relationship.  Defendants assert that, once Plaintiffs
understood their desire to terminate the CBA, Plaintiffs
sent the Certificate of Withdrawal terminating the
collective bargaining relationship.

The first hurdle Defendants face with this argument is
that it flies in the face of Plaintiffs' obvious intent in
sending the December 17, 2009, letter containing the
Certificate of Withdrawal.  Plaintiffs point out that
individual Defendant Bradway only notified the Union orally
of his intent to terminate his personal Union membership.
Plaintiffs clearly never intended that the December 17,
2009, letter in response or the Certificate of Withdrawal as
a termination of the Owner-Operator Agreement and the 2006
and 2010 CBAs.

The second hurdle -- an even more imposing obstacle --
is Defendants' argument is unsupported by either the
language of the Certificate of Withdrawal or the language of
the Agreements.  Though it is true that an effective notice
of termination does not need to employ any particular

language, it still must "express an unequivocal intent" to
terminate the collective bargaining relationship.  <u>Labonte</u>
<u>Drywall</u>, 2015 WL 4597552 at *5.  The Certificate of
Honorable Withdrawal states that Scott Bradway, <u>not</u> Bradway
Construction, Inc., has "cease[d] performing the work of an
Operating Engineer." (Dkt. No. 46, Attach. 3.)  Plaintiffs'
letter containing the Certificate of Withdrawal is addressed
to "Brother Bradway." (<u>Id.</u>)  The language unambiguously
refers to an individual, not a company.  While it terminates
Bradway's individual relationship with the Union, it does
not even obliquely reference the collective bargaining
agreement between the Union and the employer.

Moreover, Defendants' construction requires a re-
imagining of the termination provision of the 2006 CBA.  The
actual language of the contract states that the agreement
will continue in force from year to year "unless either
party .. gives notice in writing to the other party of its
intention to terminate." (2006 CBA 17, Ex. M, Dkt. No. 31,
Attach. 8 at 45.)  The natural reading of this provision is
that Party A must give notice in writing to Party B of Party
A's intention to terminate.  Defendants' argument would

change this to Party A giving notice in writing to Party B
of Party B's own intention to terminate.  This
interpretation renders the word "notice" nonsensical.  <u>Cf.</u>
<u>Labonte Drywall</u>, 2015 WL 4597552 at *8 (rejecting the
plaintiff's interpretation of the contract language because
it rendered "the 'unless' clause . . . superfluous and
contravene[d] the well-recognized 'canon of construction
that every word and phrase of an instrument is if possible
to be given meaning'").

Consequently, the most reasonable interpretation of the
termination provisions of the Owner-Operator Agreement and
the 2006 CBA is that the party <u>seeking to terminate the</u>
<u>agreement</u> give written notice to the other party of this
intention.  It is undisputed that Defendant Bradway's
communication to the Union in 2009 regarding his desire to
leave the Union was <u>not</u> in writing.  The Certificate of
Honorable Withdrawal that the Union sent in response to
Defendant Scott Bradway's notice of withdrawal of <u>personal</u>
membership in the Union does not constitute the timely and
unequivocal notice <u>by the employer</u> to terminate the CBA.

Individual Defendant's Union membership is separate

from Corporate Defendant's collective bargaining relationship.  Thus, Defendants never provided adequate notice of any intent to terminate the Agreement.

As Defendants conceded at oral argument, the court's ruling on Plaintiffs' motion on the primary claims is necessarily fatal to Defendants' counterclaims.  Defendants' cross-claims are preempted by ERISA, the LMRA, and the NLRA. Trs. of Twin City Bricklayers Fringe Ben. Funds v. Superior Waterproofing, Inc., 450 F.3d 324, 334 (8th Cir. 2006) (concluding that state law claims were preempted under § 301 of the LMRA because they were intertwined with the terms of the CBA and any resolution was dependent on analysis of the CBA); Pingiaro v. Std. Ins. Co, 986 F Supp. 2d 96, 102 (D. Mass. 2013) (finding ERISA preemption for claims of, inter alia, implied covenant of good faith and fair dealing and violation of chapter 93A because they "related to" an ERISA plan).  Defendants' reliance on contract law for support of their arguments is misplaced in the ERISA arena.  All their cross-claims are preempted by federal law.

In short, there was no adequate notice and Defendants were obligated to perform their responsibilities under the

Owner-Operator Agreement and 2010 CBA through June of 2013.
It is undisputed that Defendants have no obligations after
that.   Under the terms of those agreements, Defendants must
remit any delinquent contributions.   Furthermore, Defendants
are liable for the contributions, interest, liquidated
damages, attorney's fees and costs, including the costs of
the audit itself.   Because at oral argument, Defendants'
counsel made it clear that they wish to contest certain
details of the damages claim, the court will permit further
briefing on this issue.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs' Motion for
Summary Judgment and Motion for Costs and Attorneys' Fees,
(Dkt. No. 31), is hereby ALLOWED in part.   Defendants' Cross
Motion for Summary Judgment, (Dkt. No. 35), is hereby
DENIED.   Plaintiffs' Motion to Strike, (Dkt. No. 47), is
hereby DENIED as moot.

On or before October 30, 2015, counsel for Defendants
shall submit to the court supplemental materials regarding
their challenge to the assessment of damages.   Counsel for
Plaintiffs may respond to this submission on or before

November 30, 2015.  The court will consider these submissions on the papers and determine what further proceedings, if any, are necessary.

It is So Ordered.

/s/ Michael A. Ponsor
MICHAEL A. PONSOR
U. S. District Judge